more than a pretext to get into the room. I would agree with that. But once in, with apparent authority, everything follows in consequence, doesn't it? If there's apparent authority, I would agree with that. But my argument is there's not apparent authority because they can't believe that she has authority to say yes at that point because she'd already said no. She said no to a search, yes to a weapons check. She said no to a search, yes to a search. Arguably. I mean, because, and that's the thing. If it was a weapons search, then yes. But it wasn't, so it was another search. So she said no to a search, then she said yes to a search. When she'd already told them the reason that she didn't have authority. Now I'll give an example. Let's say I'm at my brother's house, and I have my youngest with me, and I'm holding him. And the police come to the door and say, we're doing a narcotics investigation. We'd like to search the house. And I say, it's not my house. I really don't think I can let you do that. And they say, well, we're going to get a warrant anyway, so we're going to leave an officer here. So how about we just search for weapons? And, assuming I have a different profession, I say, okay, no problem. They know that I don't have authority, actual authority or apparent authority, because I've told them it's not my house. So it doesn't, now again, it would have to be a situation where it's not really weapons. But it's not being my house doesn't mean you don't have actual or apparent authority. Well, I would say that in that situation, in my example, it means both. Because I don't have actual authority because it's not my house. I don't have apparent authority because I've told them it's not my house, and I don't think I do. Why couldn't your brother have said, if they come to search the house, you can tell them so? Because I didn't tell the cops that. Now, if I told them that, then that's an entirely different matter. But I didn't say that. I said, I don't think I can do it because it's not my house. And that's the same thing that happened here. She said, it's not my room. I don't think I can do it. And again, it's not what... What if the cops had said, yeah, you can. I mean, you're in the room, so you've got the authority to allow us to search. That would happen, though. That would be a different... I would argue that would be... Why does it matter what she thinks? Pardon? Why does it matter what she thinks? Well, it does only in the extent that what she's telling the officers... I mean, there's no dispute that it was in her room. I mean, the state doesn't dispute that now. So the state... What she tells them, it's not my room, that's the important thing. So she says, it's not my room, so I don't think I can allow you to search. It's then... Apparent authority is what the officers then reasonably think. Do they think that because it's not her room, and she doesn't even feel that she has the authority to consent to a search, that she does have apparent authority? I mean, it kind of flies in the face of what apparent authority is. And I'll back that up by saying that the state doesn't point to any case in which the consenting, or the eventually, in this case, consenting party, at any point says no. In every apparent authority case, the person says yes, and the police... Then the question is, can the police reasonably rely on that? And here she eventually says yes, but my point is they can't reasonably rely on that when she's already said no for the reason that she doesn't have authority. And again, there's no dispute. I mean, the state doesn't say now she had actual authority. It's about apparent authority. So I just... I mean, again, there's no case on point. There are a lot of cases on point where they can reasonably believe that the person has authority. The state cites an example where a woman comes in a robe, and she's holding a baby. And that certainly, the police would be led to believe based on those... And she says yes, of course. And in those circumstances, the police would reasonably believe that she had authority to... apparent authority to consent to a search. This situation is slightly analogous in that there's a baby in the room, and she's in the room. But it doesn't appear that she's living there. First of all, it's a motel room. It's not a house. It doesn't appear that she's living there. The beds are made. Everything is neat. Everything is orderly. There are no suitcases. There are no clothes. It looks like she's just there for a visit, which she is just there for a visit. And that's what she tells the officers. So I just don't see that this is any situation where officers could reasonably find apparent authority after she told them no on those very grounds. So, with that being said... Counsel, when you first began a few minutes ago, you said you were going to talk about two issues. Yeah. And the first one you described as... I thought whether the evidence should have been spoke. I probably misheard. How did you define the first issue? Ineffective assistance of counsel in failing to file a motion to suppress. I didn't think you said that, but I appreciate that clarification. Well, I might not have and if I did, I apologize. Well, and in fact, that brings me to the next point, and I'm glad you mentioned that, because my next point is it's another sort of fulcrum point in the case, and that is my argument hinges on this Court finding a reasonable probability at least that the police called the K-9 based on what they saw during that search. Now, admittedly, part of the problem with this case is that it wasn't litigated. This issue wasn't litigated. And that leaves holes in the record. Neither my side nor the State's side is perfect in that we're both arguing essentially by an absence. I mean, in my opinion, I can't show with 100% certainty that they did call the officers, or that they did call the K-9 officer as a result of what they found during the illegal search. But with that being said, on the other side of the coin, the State can't show that they placed an independent call to the K-9, or that the call was placed to the K-9 prior to the independent search. So we're both arguing essentially from an absence. So what I think is left on the scale here is surrounding circumstances. And I think in this situation, in this case, the surrounding circumstances are clearly weighed in the defendant's favor, and that they show that it was an illegal search, and then in turn, that based on the testimony of Petrilli, the officer who performed the search, a day and ago, that the officers were in the room, they knew that he had found contraband, and then they called for the K-9 after that. And I'll point to two pieces of testimony. First was Petrilli, again, the officer who performed the search. He testified that the other officers were, or that Bowersock, who was the other officer who testified, who didn't mention any of this, he testified that Bowersock was in the room with him when he performed the search. And then he says, he uses the word eventually, the K-9 officer came. Now obviously the K-9 officer is going to take some time to come. That doesn't necessarily show when the dog was called. But I think it does show that Bowersock therefore knew what was turned up as a result of the search. And at that point, they're going to call for the dog. The second bit of testimony was Banago. She testified that the other officers were in the room, or at least she strongly implied it. She used the word they. She testified that, she said, well, one of the officers searched the room, and then after he was done, they left the room, which obviously implies that the other officers were in the room. Now I think that's all supported by common sense. Bowersock's testimony is, well, we went up to the room, we asked for consent, she said no, and then what happened? Well, then we closed the door and left and called for the K-9. Now, okay, if we don't have Petrilli's testimony, that's moderately reasonable. But we have Petrilli's testimony, which is that he was up there at the same time, they asked for consent, she says no, and then Petrilli says, well, can we do a weapons search? And she says, okay, you can do a weapons search. So he comes in and he finds contraband, and then he doesn't tell anyone about it, and he just sits down, and then he just randomly sits down and waits for the dog to show up. The dog shows up and alerts. Then they say, okay, Petrilli, go get the warrant. So he goes and gets the warrant, and he doesn't mention anything in the warrant about the fact that he found the contraband that they called the dog to alert on. I mean, it's just, I don't see how Bowersock's considered 100% accurate when you have Petrilli saying, I did the search, and I found, I mean, and that aspect of it is undisputed by the state. He found some of the contraband, at least the packaging materials. And I would add to that, if the police thought they had apparent authority, the state argues now that the police could reasonably believe they had apparent authority. If the police at the time thought they had apparent authority, why didn't they immediately arrest Bannego? Because if they have the authority to search the room, and it's a valid consent, and they find contraband, you place her under arrest. You don't have to wait for the dog. You don't have to go get a warrant and leave out that you did the search. You just arrest her. I mean, it's not rocket science to figure out that they didn't even think they had apparent authority to search. Well, I don't follow. Maybe they just didn't think it was her. Well, they weren't going to let her go, and they weren't going to leave her in the room alone, so they weren't convinced that it wasn't hers. But it doesn't, I mean, I guess my point is not that they shouldn't have arrested her. My point is that they didn't need to take all of the subsequent steps of calling for the dog and applying for a search warrant if their weapon search, which turned out drugs, was a valid search. Because at that point then, once they see drugs, they've got certainly cause to search the rest of the room. They search the rest of the room, and they charge the defendant with it. Why take the time to wait for the dog and to get the warrant? Do you see what I'm saying? It truly says, I go into the room, I search, I see what is contraband, and then I sit down and I wait for the canine to come. I mean, if they're searching a car, and they search the car and they find drugs in the car, they don't go back to their squad car and wait for the dog to come to alert and then go get a warrant. I mean, no, once you find the drugs, you arrest the person, or in this situation, you'd be charging the person that they already had under arrest down in the room. There's a lot of extra hoops that they took the trouble to jump through, calling the canine, applying for the warrant, waiting for the judge to issue the warrant, coming back and doing the search, when, since they had already found the contraband, if they had properly found the contraband, they didn't have to take those steps. I understand your argument. Thank you. So, I would conclude this portion of my argument that I mentioned a few minutes ago, which was, I don't think either side here can prove with 100% certainty what happened. And the problem, of course, is that it wasn't litigated. What my burden is to this Court is to show that there's a reasonable probability that a motion to suppress would have been granted. And again, both sides are arguing in the absence of any definitive testimony or facts here, but I think that the weight is on my side to at least show the reasonable probability. I'll add to that just briefly that I'm not asking that this Court suppress the evidence. I'm just asking that this Court reverse this conviction and remand for a new trial at which this new trial attorney would file a motion to suppress, and therefore it would be litigated. And if the trial court disagrees and doesn't suppress it, then he's convicted again, and it comes back up. But I would also say, in the alternative, if this Court does decide that there's not enough, I would at least ask, the State mentioned this in its brief, and I would agree with the State to the extent that I would ask that this Court decide that there's not enough and not hold it against the defendant in terms of losing on this argument, but rather at least leave it open for him to file a post-conviction petition. My second argument that I'm going to address is counsel choice. My main point on this argument is that the record, I think, arguably refused that the trial court's finding that this was a dilatory tactic. I know this Court is faced with a lot of these situations where the jury's walking in the room, the defendant jumps up and says, I want a paid lawyer. And then the judge says, why do you want a paid lawyer? What's your problem? He says, well, I'm not happy with my public pretender. And the judge says, well, what's the problem? He's not representing me to the best of his capabilities. He doesn't believe in my innocence, or whatever the case may be. They're sort of a privilege sheet of standard complaints about defense counsel. And then the judge says, well, who do you have? Do you have a lawyer of mine? Well, no. Well, do you have any money for a lawyer? Well, no. But I can. I'll get someone. I've got some family, and they can pay. Well, who would you hire? When can you hire someone? Well, I don't have anyone. Now, that's sort of the what we have here is someone who was trying to work, Mr. Kelly was trying to work out his issues with his trial attorney, his appointed attorney before trial. He had some reasonable expectations. He had some admittedly unreasonable expectations. One of his complaints was a bond reduction. I mean, that's irrelevant. But he had a complaint about a motion to suppress evidence and some other things that he wanted her to file. So, as they're getting closer to trial, they're waiting. The state gets two continuances. They're waiting for the lab results to come back. He, for some reason, thinks that the lab results will come back in his favor. So, he thinks that that's going to change the outcome. Now, arguably, that's unreasonable, but nevertheless, that's what he thinks. So, the lab results come back. The attorney says, we're going to trial. He says, you haven't filed my motions. What about the lab results? Well, the lab results are in, and it's not looking good. We're going to trial. Well, wait. I have to hire a new attorney. So, he tells her that. He says, I want to hire a new attorney. She tells the trial court that he told her before coming into court that morning, well, I want to hire a new state attorney then. So, he takes the necessary steps. He calls an attorney, or at least his family calls an attorney. He mentions the attorney by name, Harvey Welch, who's an attorney in Champaign-Urbana. He says, she says, the trial court says, well, have you retained him? And he says, well, my grandmother's on her way down from Chicago, arguably, then, to pay his retainer. And he says, but Mr. Welch said that he's not going to represent me unless I can get a continuance on this matter, which I think is a reasonable sort of precondition for representation. I mean, you can't come in and try a case that he just was retained on. So, my point, the long and short of it is... Didn't the court specifically note that on April 28th, the defendant's case was called in the courtroom, and some of Welch's representatives were in court, and yet said nothing? Right, but I think that was before. I'm almost positive that that was before his results had come back, and before he had spoken to his attorney. The trial's the 29th. Right. Well, he hadn't retained him. I mean, I don't think that, I don't think it can be expected that Welch's representatives are going to stand up and say, we're ready to jump in. No, but they could certainly step up and say, yes, Judge, we've had conversation with Grandma. She's coming down tomorrow with a purse full of money, and upon receipt, we will be entering her appearance. And I won't speak for everybody on the panel, but personally, if that occurred when I was a trial judge, I'd say, fine. That's fine. We'll give you a continuance on their representation that assuming the money's coming tomorrow, you're getting into the case. Welch's office had every opportunity to say, yes, we've had discussions with this person. And frankly, if they'd had those discussions, somebody from Welch's office could have been there on the 29th as well to say, Grandma's on her way. We're not in yet, but we've had these discussions, and it's likely that we're getting in. Most trial judges would say, fine, I understand that. We'll set this over for a couple weeks and do it in attorney's staffs. Or at a minimum, you could have provided us with an affidavit from Welch's office saying, yes, we were going to represent him when Grandma gave us the money. Yeah, I'm not going to disagree that all of those facts certainly would have helped this case. And we wouldn't even be arguing this, because I would submit that he would have gotten a continuance. But at the same time, those things aren't required. And in this situation, the trial court never said, I don't believe you, that you haven't talked to Welch's office. Now, if that was the case, I don't think I would really have much to go on here. But she didn't say, I don't believe you. She just said, this is a dilatory tactic. Your complaints about your trial counsel are not well-founded, so I'm not going to grant you a continuance. And the other thing I'll say is, the state had already had two continuances. The defendant had only had one. He's locked up this whole time. What does he have to gain? I think this is something that's really important. What does he have to gain by delaying anything? He's in jail. Maybe jail is better than DOC, but isn't that kind of shades of gray? Now, if he's out sauntering around town and he wants to extend his arguable freedom, I can understand a finding of a motion like this where he has concerns with his attorney, at least one of which arguably in hindsight is reasonable, a motion to suppress. I don't think it's you know, he's just asking for a continuance. I don't think that he's asking and again, the state had already had two. Not that everything has to be even Stevens, but the state had already had two, and it wasn't unreasonable that the court granted those two. And my point is, why not just grant him one here? That's a lot easier to just give him another couple of weeks than to say no, I find it's a dilatory tactic, even though he's in jail, and just get it on with him. The other thing is the state didn't vehemently object to this at trial. I think it's important also to note that the state's position was just, they said state, what do you have to say? Well, we're ready for trial. Now, if the state had said well, we've got all our witnesses, this is a really complex case, we're not going to have another witness he's going to go to Barbados for six months and this is going to be impossible to try this case, again, that's another factor to be weighed here, but that didn't happen. What happened is the state said, well, we're ready, which to me at least indicates that the state didn't really mind if he had gotten a continuance. I will admit that this is not the perfect counsel choice argument, but at the same time, I will strongly argue that it's closer to those cases in which he has counsel standing by than it is to the cases in which the defendant just jumps up at the last minute, doesn't have a name, doesn't have any money, and doesn't have anything to go on. Thank you. On issue number one, a couple of initial points opposing counsel asserted that the weapons search turned up drugs, there was no evidence that the weapons search turned up any drugs. Instead, the record reflects that there was a plastic bag that was found by Petrilli in the weapons search and also, of course, in execution of the search warrant, and in the plastic bag was, according to Bowersack, who had executed the search warrant, was a black case, a grinder, a sifter, and two spoons and a small measuring spoon. There was no evidence that any drugs were found. Also, Petrilli did not testify that Bowersack was in the room. Instead, he testified that when he was talking to Benigo or Banago, Officer Baltzell and later on, Officer Trock, who was the canine officer, were present. And the state's argument is that the record fails to show that there's any connection whatsoever between the weapons search and the request for the canine unit. The record affirmatively shows there was no such connection. Bowersack testified that after Benigo initially refused consent, he stepped outside the room with Baltzell, closed the door, made a phone call for the canine unit, the canine unit arrived, a sniff was performed, and then a decision was made to apply for the search warrant. And the affidavit for search warrant did not contain any reference to the weapons search. Since the evidence was obtained from a wholly independent source, the execution of the search warrant, which was sought based on the results of the positive dog sniff, whether or not the weapons search was illegal, thus, is completely irrelevant. The state made that argument, pages 18-24 and page 28 of its brief. It argued that the weapons search was not the impetus for requesting the canine unit, but was wholly independent of it. And it also argued that as in Rendon, Teheri did not apply where there was no impermissible expansion of the independent source doctrine. Now the state also argued alternatively that the inevitable discovery doctrine applied. Here the evidence was actually found by lawful independent means. The inevitable discovery doctrine applies to evidence which would have been found by lawful means independent of any constitutional violation. So therefore, the rationale under which the evidence is admissible is the independent source doctrine, which the state did argue, rather than the inevitable discovery doctrine. The state also argued, page 29 of its brief, that to the extent the record is insufficient to determine whether counsel was ineffective in failing to file a motion to suppress, this court may decline to address it, leaving the defendant the option of raising it in a petition for post-conviction. Because no motion to suppress was filed, the record contains no factual findings regarding the propriety of the officer's action, and the state had no burden or reason to present evidence on the issue. The state had no reason to present evidence of what the officers did or could have relied on in finding that Benigo had apparent or actual authority to consent to search the room. It didn't have any reason to present any additional evidence regarding the time or the circumstances of the dog sniff. The record affirmatively does show that the request for the dog sniff was wholly unrelated to the weapon search. It also shows that Benigo did have apparent and actual authority to consent to the weapon search. To the extent that this court has any question about those or any other issues relating to the defendant's argument that counsel should have filed a motion to suppress, it should decline to address those arguments where the record is incomplete. The defendant then would have the option of raising them in a post-conviction petition. Contrary to the defendant, the weapon search was not the impetus for calling the K-9 unit. Bowersock's testimony affirmatively establishes that. Contrary to the defendant, Bowersock's testimony does not conflict with Benigo's testimony that the officers left out after the weapon search and Petrilli's testimony that while he was talking with Benigo, Sgt. Balcell and eventually K-9 Officer Trock were present. Neither Petrilli nor any other witness testified that Bowersock was in the room and refused consent. Neither Petrilli's nor any other witness's testimony indicates that Balcell, like Bowersock, could not have re-entered the room after Bowersock called for the K-9 unit. Petrilli's testimony that the K-9 officer eventually was present is consistent with Bowersock's testimony that he called for the K-9 unit which then arrived and performed the dog sniff. Benigo's testimony that the officers left out after the weapon search indicates only that there was more than one officer present during the weapon search. She did not testify and was not asked whether any officers left before the search or whether any returned after leaving. The officers she referred to may or may not have included Bowersock but could have re-entered the room. There were other officers present at the scene. Officer Lieb was at the scene with Bowersock, his partner. Petrilli testified he arrived as their backup and later went with Balcell to room 215. Bowersock testified that when he first went to the room other officers were speaking to Benigo. He didn't testify, was not asked who they were, so Officer Lieb or some other unnamed officer or officers could have been among the officers who Benigo testified left after the weapon search. There's no testimony that contradicts Bowersock's testimony. After Benigo refused consent to search the room, Bowersock stepped outside, closed the door, and called for the K-9 unit. No evidence supports defendant's argument that the K-9 unit was called after the weapon search or that the weapon search or its result was somehow the impetus for calling the K-9 unit. The record affirmatively does show the call for the K-9 unit was made before and unrelated to the weapon search. Unlike Terry, the record fails to show that the dog sniff was a mere ex post facto formality performed to justify an illegal search. Instead, it shows the request for the dog sniff was made before unrelated to and independent of the weapon search. Whether or not the weapon search was illegal, thus, is entirely irrelevant. The record, nevertheless, shows that the weapon search was legal. Defendant argues it was not because he says Benigo had no authority to consent to a search of the room where she testified she told the officers it was not her room and where she had not paid for it. Now, her statement that it was not her room and she hadn't purchased it indicates that she believed it was not her room in that she hadn't paid for it. The law is very clear that whether or not someone has common authority to consent to premises is not based on the law of property. Instead, it's based on whether or not a person has mutual use of the property and general access or control for most purposes. As the court held in Posey that Benigo had not paid for the room didn't deprive her of common authority to consent to search it where it was not disputed that she had unrestricted access to all portions of the room. Now, in Georgia v. Randolph, the U.S. Supreme Court described its decision in Matlock and said that when a woman comes to the door with a baby on her hip then that is enough to indicate that she knows that she has a right to be there and she can consent to a search of the premises. Benigo was in the room with a very young baby. Bowersock testified that when they went to the room they saw the baby on the bed was only a few months old. He also testified that there was a diaper bag, car seat there, and the TV was on. That's more than enough to indicate that she had apparent authority to consent to search the room. To the extent that this court might find that something more was needed, again that goes to the fact that this was not a record that needed to be developed on that issue because no motion to suppress was filed. So if there's any question that the court has as to whether or not the officers were reasonable in believing she had apparent authority, then the correct result is to decline to address this issue and leave it for a defendant to develop the record in a post-conviction proceeding. The states nevertheless would argue that the record is sufficient to show that she had apparent authority for the reasons I just discussed. And also, contrary to the defendant, that the beds were made and no suitcases or clothing were mentioned in the testimony describing the room's contents doesn't indicate that she was a mere visitor any more than it indicated that the defendant was a mere visitor. The defendant who had paid for the room apparently had no suitcases or clothing there either. And that the beds were made is consistent with the fact that as the receipt that the police found in the car showed it had been rented that day and with the fact that the hotel room beds are made when housekeeping visits daily. And the police did not need evidence that Benigo or defendant were living in the room or that she or defendant had been there long in order to find that she had common authority to consent to a search of the room. And also on the issue of developing a record on this point it is possible that if such a record were developed the evidence might show that as Benigo testified at trial Benigo testified at trial that they were there because the defendant wanted to have visitation with their child and had rented the hotel room for that purpose. The evidence might well show if any witness was asked about that that perhaps defendant or Benigo told the officers that and they knew that. It also might show that when the hotel clerk ran the room key he might have learned that Benigo was a registered guest. But again, since that was not an issue, questions were not asked on that issue. So there was no basis for a motion to suppress and counsel could not have been impected for failing to follow. And as to issue two, the state would rely on the argument that we made in our brief that whether or not the defendant was dilatory was only one factor in determining whether the court abused its discretion in denying him a continuance. And under the Illinois Supreme Court's decision in Segoviano, the main and deciding factor is whether or not counsel stood ready, willing, and able to make an unconditional entry of appearance on the defendant's behalf. And here the court found that that was not the case and as your honors were discussing, Harvey Welch's, members of Harvey Welch's firm were present in the court the day before and said nothing about being contacted by a defendant or anything having to do with this case. We would just rely otherwise on the arguments that we made in our brief and unless this court has any questions, we would simply ask that they be referred. Thank you counsel. Mr. Delcomen, Rebuttal. Briefly, your honors, the state mentioned that I had said that Petrilli had found drugs and if I said that I was being a little too loose, I didn't think I said drugs, I thought I said contraband. But what I want to point out is that there is no dispute what he did find which was the spoons, counsel mentioned the spoons, the doorman, the grinder, the sifter, contraband. There's no way that Petrilli is going to see that in the bag and then sit down and ignore it and not mention it to any of the other officers, any of the supervisors and not put it in the application for a search warrant. And again, the state's argument would require that this court believe that that was what happened. And common sense just doesn't support that. He knew it was contraband when he saw it. They went up to that room essentially because of a spoon. That was the only contraband that they thought that Mr. Kelly had on him. The driver of the car had drugs in his pocket, but Mr. Kelly had the spoon with no residue on it. That's enough to get him up to the crime scene. They're going to find spoons, all the packaging materials, and they're going to sit down and ignore it and not mention it to anyone. It just doesn't happen that way. The only other thing I'm going to say is just to reiterate a quick point that I made before is that the burden is not 100% that this motion would have gone through. It's just a reasonable probability. And again, with that in mind, what I just mentioned about I just don't think that this could possibly have happened this way. I think there is a reasonable probability there, and so I would ask that this Court reverse this. Was Ms. Shepard correct? There's nothing that contradicts Bowersox's statement that he immediately went out and made the call for the K-9, that he did not stay in the room for the search? No, I think there is. I think that if you, there's testimony that strongly implies that other officers were in the room. Now, they don't mention him by name because Vandego doesn't know Officer A from Officer Z. So she just says that one of the officers did the search. That was Petrilli. He said he did the search. And then she says, then they left. So that's multiple officers. So there were other officers in the room, according to Vandego. That's what Petrilli's testimony also strongly indicates, was that other officers were in the room with him when he did the search. And that makes sense. If it really is a weapons search, you don't want to be, if I were a police officer, I wouldn't want to be bending over looking in a plastic bag while the person I'm afraid of is standing behind me. When my compatriot cops are standing out in the hallway, I mean, I just don't think that it went down that way. But again, the testimony strongly indicates that other officers were in the room. It doesn't show for sure that it was Bowersox. I think there was evidence that there was another officer who didn't testify. Right, there were three officers that went up to the room. Now, Bowersox's testimony was, we got up there, we asked for consent, she said no, then we closed the door and said thanks and closed the door and called for the K-9. He doesn't mention that Petrilli stayed in the room, but obviously that's not disputed, that Petrilli stayed in the room. I think common sense would indicate again, you know, this is the problem with the case, this wasn't litigated, but I think common sense would indicate again that that's not the way things went down. That Petrilli's testimony was probably the way that things went down. They stayed in the room when he asked for the weapons search, he went through, he found the contraband, and they said, let's call for the dog. And then they called for the dog. And again, it couldn't have been about, they couldn't have believed that it was about search, or they wouldn't have had to call for the dog, they wouldn't have had to get the warrant because they saw the contraband. So, and again, it's a reasonable probability and I think that with all of that in mind, that Mr. Kelly's met that verdict. Thank you. Thank you, Counsel. We'll take this matter under advisement.